PETITION OF METROPOLITAN SAND & GRAVEL CORPORATION, as owner of THE D/T METROPOLITAN NO. 6, et cetera.

O'BRIEN BROTHERS, INC. as owner of THE scow WALL LIGHT, Libelant,

v.

COLONIAL SAND & STONE COMPANY, Respondent.

Nos. 20087, 20182.

United States District Court
E. D. New York.

Sept. 25, 1958.

On Motion for Rehearing Oct. 24, 1958.

**676**

Macklin, Speer, Hanan & McKernan, New York City, for petitioner, Metropolitan Sand & Gravel Corp., Charles J. Carroll, Jr., of counsel.

Foley & Martin, New York City for libelant. John H. Hanrahan, Jr., New York City, of counsel.

Hagen, Johnson & Quarto, New York City, for respondent. John F. Quarto, New York City, of counsel.

MOORE, Circuit Judge (sitting by designation).

These two suits arose out of the grounding of a scow, the "Wall Light", owned by O'Brien Brothers, Inc., referred to as "O'Brien", chartered to Colonial Sand & Stone Company, referred to as "Colonial" and being towed by a tug (No. 6) owned by Metropolitan Sand & Gravel Corporation, referred to as "Metropolitan". The first suit, instituted after a claim for damage was made by O'Brien upon Metropolitan, sought limitation of or exoneration from liability, the second by O'Brien against Colonial for breach of charter and damages to the scow. Thereafter O'Brien filed a contingent claim against Metropolitan in the limitation proceeding asserting that any damage to the scow was the primary fault of Metropolitan and that, if O'Brien should recover against Colonial, Colonial should recover over against Metropolitan. By consent the suits were tried together. Limitation of liabili⌣ in the sum of $2,000 was stipulated.

On November 19, 1952, at about 5:00 P.M., the scow "Wall Light" ran aground in Hempstead Harbor, Long Island, N. Y., while under tow by the tug, Metropolitan No. 6. The scow at the time of grounding was loaded with sand and was being towed by Metropolitan's tug to Metropolitan's stakeboat in the Hempstead Harbor. While the tug and scow were south of Bar Beach proceeding in an easterly direction, the stern of the scow swung to the north and its bow to the south, and thereupon grounded, becoming suspended on both sides of the channel, with water beneath the center portion of the scow. Efforts to pull the scow off at the time were fruitless but at 10:00 P.M. that evening, about two hours before high water, she finally floated off on the flood tide. The damage claimed was aggravation of a twist in the scow. Prior to the grounding she was slightly twisted, apparently about two inches down on the port stern and the same amount on the starboard bow corner. After the grounding the twist was increased to about four inches on each corner. The area in which the scow grounded showed seven feet of water at

mean low water (approximately 6:13 P.M.). It should have been obvious that for some time before or after that hour a scow could not have been towed safely through such waters.

■ The primary liability of Metropolitan and the secondary liability of Colonial have been established. Neither Metropolitan nor Colonial has come forward with any evidence sufficient to rebut this conclusion. Accordingly, the only two issues before the court are the fact of damage and the amount thereof.

The "Wall Light" was one of a fleet of 42 scows sold to Colonial on July 29, 1953 for a bulk sale price of $514,000. Although Burton E. O'Brien, vice president of O'Brien, claimed in his deposition taken by Colonial that at the time of the sale an individual price was established for the "Wall Light", he did not disclose what the price was, notwithstanding the fact that both O'Brien's libel against Metropolitan and Metropolitan's petition for limitation of liability had been filed prior to the consummation of this sale.

The price fixed for the "Wall Light" in the July 1953 sale would have had evidentiary value as to its market value nine months prior thereto. There were thirteen sister scows of the "Wall Light" involved in the sale. Presumably at least some of these were in normal and sound condition. A comparison of the July 1953 market value as depreciated, if any, of the "Wall Light" with the market value of its sister scows would have provided a ready and sound measure of damages. O'Brien, however, chose to rely in this litigation on a speculative figure for market value of $22,680, arrived at by O'Brien's expert by estimating the reproduction cost and deducting therefrom the depreciation based upon an unexplained progressive depreciation table.

■ At the time of the July 1953 sale, O'Brien knew, or should have known, that the market value of the "Wall Light" and its sister scows were important and possibly determinative factors in this litigation. Its failure to preserve any market value figures for the "Wall Light" and its sister scows deprives it of an important item if in fact appraisals were obtained or valuations fixed on each barge in the sale. Not having established by any competent and credible evidence the normal market value of a scow of the class of "Wall Light" or the depreciated value of the "Wall Light", O'Brien has failed to carry its burden of proving a recoverable depreciation loss.

The only point remaining is the ascertainment of the damages equivalent to the cost of repairs necessary to place the scow in as good a condition as before the accident. In this connection it should be noted that the witness who remained aboard as bargee after the 1953 sale of "Wall Light" and who did not leave this position until 1957 testified that the twist was still in the scow when he left. It was conceded by O'Brien that no attempts were made to remedy the twisted condition or to repair any damages caused by the twist. From all the testimony on the trial, I find that the twist did not render the scow unseaworthy or unfit for service and that the "Wall Light" was thereafter regularly used in the normal course of business notwithstanding the twist. The only noticeable disability caused by the twist was the reopening of an old leak around the king posts. The testimony of the bargee revealed that his description of the damage noted on a post card mailed to O'Brien two days after the accident was in conflict with the testimony of others and with the actual use to which the barge was thereafter put.

On November 24, 1952 O'Brien had a survey made of the "Wall Light" while she was lying afloat at a shipyard in North Bergen, N. J. Two surveyors for Metropolitan were also present but did not sign the survey. The survey lists ten separate items of repair and states that the total cost of the listed repairs is $7,640. I find that this estimate, so far as it attributes these items to the grounding on November 19, 1952, is exaggerated, and accordingly reject it. No

attempt was made either in this survey or in the surveyor's testimony at the trial to render a separate estimate for each of the ten items of repair. There is lacking credible proof to show that many of these items bear any relation to the aggravation of the twist. For example, the fifth item states "Roof covering on cabin wrinkled and cracked; covering is to be renewed after hull is straightened with all necessary flashings." There is no credible testimony showing that the roof became wrinkled and cracked from the grounding. Colonial's surveyor was emphatic in his testimony that the slight twist which was in the scow would not cause any such damage to the cabin.

Furthermore, O'Brien's surveyor conceded that his survey was premised on the erroneous assumption that prior to the November 19 grounding the scow possessed no twist at all.

■ Lastly, most of the items of repair make express allowance for the removal or adjustment of admittedly sound parts and the replacement or readjustment thereof in order to effect the enumerated repairs, none of which were in fact ever made. As an instance, the tenth item directs that "Side wearing pieces in way of scarphs are to be removed to effect caulking and afterwards replaced, any parts broken to be new." The fact that repairs were not made, of course, does not prevent the award of damages for necessary repairs. Nevertheless, this fact can be considered in trying to arrive at a just and fair conclusion as to the seriousness of the injury. Since the scow has remained in serviceable condition without the benefit of the costly and extensive repairs listed in the survey, the unquestionably sound principle set forth by Judge Addison Brown in The J. T. Easton, D.C.S.D. N.Y.1885, 24 F. 95, 96, twice quoted with approval and followed by the Court of Appeals for this circuit in barge cases (Bleakley Transportation Co. v. Colonial Sand & Stone Co., 2 Cir., 1957, 245 F.2d 576; Zeller Marine Corp. v. Nessa Corp., 2 Cir., 1948, 166 F.2d 32, 33), should be controlling here:

"An owner whose boat is damaged by the negligence of another is entitled to have his boat repaired in a way which will not leave her essentially depreciated in her market value, or inferior for practical use. But where an injury can be perfectly repaired for all practical uses at slight expense, but, as in this case, cannot be placed in exactly the same condition as new, except by taking out and replacing much other good work at a very considerable expense, the court must hesitate in allowing damages on the basis of the latter mode of repair, especially where, as in this case, though a long time has elapsed, no such repair has been made. The court could only be warranted in allowing for new beams upon very plain and certain proof that the market value of the boat will otherwise be materially and certainly lessened."

■■ While the O'Brien estimate of the damage based upon its expert's survey is not accepted as conclusive of the damage, the fact remains that the scow did suffer some damage in the grounding and afterwards was not in as sound condition as she had been. Colonial's surveyor estimated that the cost of taking the twist out without any replacement of good parts or rebuilding of the scow would be "less than two thousand dollars, fifteen hundred to two thousand dollars". Accepting this estimate as more in line with damages properly assessable as a matter of law, I find that the cost of such repairs would be $1,800. The cost to O'Brien for its survey, $60, will also be considered as allowable damages.

It follows that Metropolitan is primarily liable to O'Brien in the amount of $1,860 plus interest and costs and that Colonial is secondarily liable to O'Brien in the same amount. Colonial's contingent claim for recovery over against Metropolitan in the limitation proceeding is allowed in full.

The foregoing opinion constitutes the findings of fact and conclusions of law

required by Admiralty Rule 46½, 28 U.S.C.A. Submit final decree in both actions in ten days.

### On Motion for Rehearing.

Metwood Investing Corporation, formally known and sued herein as Metropolitan Sand & Gravel Corporation, moves for rehearing on the grounds that the amount of damage was erroneous and that the allowance of interest was improper.

As to the amount of damages, the basis for the motion appears to be that Colonial's surveyor did not know that prior to the grounding the barge had a slight twist in it when he testified (R. 23) that it would cost $1,500 to $2,000 to straighten out the barge. Assuming that Colonial's surveyor was ignorant of the prior twist, a rehearing would be in order only if Metropolitan's assumption that the cost of straightening out the slight prior twist would as a matter of law have to be deducted from the cost of straightening out the aggravated twist.

■ This assumption, however, is erroneous. Obviously the barge was damaged by having the degree of twist more than doubled, and some cost would have been entailed in straightening out this aggravated twist. There is no showing that a complete realignment would have cost any more than stopping the straightening out process when the twist was reduced to exactly the same degree as it had been prior to the grounding, and it would be rather curious if such a showing had been made. In fact, counsel for Metropolitan in his moving affidavit intimates the contrary, stating that "he (Colonial's surveyor) was not asked to estimate the cost of taking out the pre-existing twist, which cost may have been the same." The fact that the cost of repairing the pre-existing twist may have been the same as the cost of repairing the aggravated one becomes irrelevant once it has been found, as it was, that the barge's condition was weakened by the grounding and resultant increased twist.

■ While interest is properly allowable even where the repairs are not made, O'Donnell Transportation Co. v. City of New York, 2 Cir., 1954, 215 F.2d 92; In re Hibbard, 2 Cir., 1928, 27 F.2d 686, when the additional facts that the barge was in useable condition without repairs, that O'Brien sold the barge in July, 1953, less than a year after the grounding, and that no depreciation loss on the sale was shown are considered, it seems inequitable to grant interest. The award of interest, therefore, is set aside, and in all other respects the motion for rehearing is denied.