The **CALLANAN ROAD IMPROVE-
MENT COMPANY**, Plaintiff,

v.

**CAYUGA CONSTRUCTION CORP.,**
Defendant.

No. 65 Civ. 45.

United States District Court,
N. D. New York.

Dec. 14, 1967.

Opinion on Issue of Damages
Oct. 4, 1968.

**1318**

Mahar & Mason, New York City, for plaintiff; Martin J. McHugh, New York City, of counsel.

Jarvis & Pilz, Healy & Baillie, New York City, for defendant; Thomas L. Rohrer, Emil V. Pilz, New York City, of counsel.

## OPINION

McLEAN, District Judge.*

This is a suit in admiralty by the owner of five barges which in the summer of 1963 were employed in transporting rip rap stone from a quarry in Secaucus, New Jersey, to Port Elizabeth, New Jersey, where the stone was used by defendant in constructing a wharf for the Port of New York Authority. Plaintiff claims that each of the barges was severely damaged in the course of discharging operations carried on by defendant. Plaintiff contends that it is entitled to recover for that damage on two theories: (1) that defendant expressly agreed to pay plaintiff for all damage to the barges caused by the discharging operations, regardless of any negligence on defendant's part; (2) that in any event, the damage was caused by defendant's negligence. Defendant disputes each of these contentions. After hearing the evidence, I find the facts to be as follows.

The Callanan Road Improvement Company ("Road Improvement") is in the construction business. It owns marine equipment, including the five barges involved here. An affiliated company, Callanan Trap Rock Corporation ("Trap Rock") operates a stone quarry at Secaucus, New Jersey. Before Trap Rock was formed, Road Improvement had operating rights to this quarry under a contract with the Board of Freeholders of Hudson County, New Jersey.

On March 31, 1962, Road Improvement entered into a contract with Mario Gallo by which Road Improvement granted to Gallo "the exclusive right to purchase, distribute and/or sell 'rip-rap' from said quarry to be shipped by water

---

* Of the Southern District of New York, sitting by designation.

for use in the Port Newark-Port Elizabeth area." Road Improvement agreed to sell and Gallo agreed to buy the rip rap "for shipment by scow to Port Newark-Port Elizabeth area at $2.00 per net ton delivered."

The contract further provided that "payment for the same shall be due when GALLO receives payment from his customer or within sixty (60) days following shipment by CALLANAN to GALLO, whichever event occurs first." Subsequently Road Improvement assigned its rights under this contract to Trap Rock and Gallo assigned his rights under it to a corporation of which he is president, Hudson Crushed Stone Sales Corp. ("Hudson").

For the purposes of this action, Road Improvement and Trap Rock may be treated as one and the same.[1] Whatever the reasons may have been for complicating the situation by creating Trap Rock as a separate entity, they are immaterial here. The fact that the two Callanan corporations chose to sell through Gallo, or his company Hudson, however, instead of themselves selling the stone directly to the ultimate purchaser, raises a question which will be discussed hereinafter.

In January 1963 defendant was awarded a contract by the Port of New York Authority to construct wharf facilities at Port Elizabeth, New Jersey. In general, the work to be done consisted of constructing a dike some 3,000 feet long parallel to the shore and some 300 feet out in the water away from the shore. Piles were to be driven in the water, sheathing was to be placed against them, and the structure was then to be reinforced with rip rap stone. On top of the dike thus created a concrete deck was to be built. Another contractor was to pump sand into the area between the shore and the dike, displacing the water and thus creating additional land all the way out from the original shoreline to the dike.

The Authority specifications for the rip rap provide:

"Rip rap shall be a graded mixture of primary crusher run quarry stone with no piece weighing more than 120 lbs. and no more than 30% passing a 2″ sieve nor more than 5% passing a No. 200 sieve and having a minimum weight dry in air of at least 112 lbs. per cubic foot when measured in an uncompacted state."

The specifications further provided that the rip rap "shall be placed, not cast by clamshell bucket or other approved means * * *." In other words, the contractor was forbidden to fling the stone from the bucket into the water. The bucket was to come to a stop over the spot where the rip rap was to be deposited, so that the stone could fall vertically from the bucket directly on to the proper place on the dike.

On January 30, 1963, Keith Callanan, president of both Callanan companies, and Battin, vice president of Road Improvement, met with Lazar, president of defendant. The two Callanan officers suggested to Lazar that defendant buy its rip rap for this job from Hudson. Following this meeting Lazar inspected the Secaucus plant. Another meeting then took place on February 8, 1963. It was attended by Keith Callanan, by Gallo representing his company, Hudson, and by Lazar on behalf of defendant.

At this meeting Lazar agreed to buy defendant's requirements of rip rap for the Port Elizabeth job from Hudson. He and Gallo agreed upon the price. There was then a discussion, of primary importance in this action, about possible damage to the barges in the course of

1. The parties do not contend otherwise. They make no distinction between Road Improvement and Trap Rock. I will sometimes refer to these corporations collectively as "plaintiff."

discharging their cargo.[2] Gallo explained that on another job with which he was familiar, the barges had been damaged during the unloading operations. Lazer agreed that when the barges were discharged, defendant's employees would leave some of the stone in the barge adjacent to the rails or sides of the cargo box. This "berm" of stone would serve to protect the rails to some extent from injury through contact with the heavy buckets used in the discharging operation.

There was also some discussion of protecting the deck area within the cargo box of the barges with a layer of concrete. Lazar agreed to do this, but whether he agreed to do so at this February 8 meeting or in a subsequent telephone conversation is not clear from the testimony. The date of his agreement as to this particular precaution is unimportant.

Callanan wanted something more. He proposed that a survey be made of each barge by surveyors representing each party at the beginning of the work and again at the end, and that defendant undertake to pay for any damage reflected on the outgoing survey which had not appeared on the ingoing. After discussion, Lazar agreed to these surveys and agreed that defendant would pay for any damage to the barges for which defendant's employees were responsible.

On February 19, 1963, defendant sent to Hudson defendant's formal written purchase order for the rip rap. It ordered approximately 163,000 cubic yards of this stone, to conform to the Port of New York Authority specifications, at a price of $2.45 per ton delivered at the job site, delivery to begin by March 15, 1963, and up to 3,000 tons per day to be delivered. The only reference in this purchase order to protecting the barges against damage was a provision that defendant would not completely unload the barges but would leave a cushion of stone on the deck. The letter said nothing about liability for damage to the barges.

Hudson accepted the purchase order and returned signed copies of it in its letter to defendant dated March 5, 1963. The letter made no reference to protecting the barges or to liability for injury to them.

It was later agreed between the parties that instead of laying concrete on the decks, timbers would be used to protect the deck surface. Defendant at its own expense installed such a timber floor within the cargo box of each barge. As it turned out, this was adequate to preserve that part of the vessels from injury.

Five barges were employed in this rip rap service, Able, Baker, Charlie, Delta, and Ida. All five were made of steel. Able, Baker, Charlie and Delta were of similar design, built by the Richmond Steel Co., Inc. in 1960, at a cost of approximately $65,000 each. Each barge was 120 feet long and 38 feet wide, with a depth of 11 feet 3 inches. Each carried a cabin on her afterdeck.

Ida was built by Wiley Manufacturing Company in 1962 at a cost of approximately $57,000. Her dimensions were approximately the same as the others, but she did not have a cabin. Her design was different from the other barges with respect to the locations of the brackets or stanchions outside the rail of the cargo box, a point which will be referred to again hereinafter. Each of the barges could carry approximately 1,200 tons of stone.

In the spring of 1963, before the barges began their voyages from Secaucus to Port Elizabeth, each of them

---

2. As previously noted, Road Improvement owned the five barges which were eventually used in this work. However, it orally chartered them to Trap Rock, apparently for the purposes of this particular job. Although this was not fully explained, presumably this was done because Road Improvement had assigned to Trap Rock Road Improvement's contract with Gallo and it was considered desirable that Trap Rock be in temporary control of the barges as well.

was inspected by two surveyors, one representing Road Improvement and the other representing defendant. The barges' condition was not perfect. The surveyors noted various dents and dislocations. The welds at the bottom of some of the brackets were fractured, as were some of the welds at the corners formed by the sides of the cargo box and the bulkheads at each end. It is unnecessary, as well as impracticable, to repeat here the endless detail of these survey reports. Suffice to say that the defects were minor, the result of ordinary wear and tear. Although the barges were not untarnished and pristine, their condition was no worse than one would expect it to be after a few years' service.

Delta was the first of the five barges to begin the transportation of rip rap. She took on her first load on April 11, 1963. Baker, Charlie, Ida and Able began on April 15, 16, 23 and May 7 respectively.

The barges were loaded at a dock at Trap Rock's property in Secaucus by means of a conveyor belt which dropped the stone from a tower on the dock into the barges alongside the dock. The stone was first carried to the top of this tower and allowed to fall down through baffles on to the conveyor belt from which it eventually fell into the barges. At low tide the conveyor belt was approximately 20 feet above the deck of the barge when the barge was light. The distance was 15 feet at high tide. The stone was dropped first into the middle of the barge. When a barge was finally loaded, a pile of stones 9 feet high sloped down from the middle to the rails on each side.

The pieces of stone varied in size. In order to pass through the opening of the crusher, one dimension of a piece could not exceed 7 inches. A piece could not exceed 2 feet in any dimension. Otherwise, it would not pass through the baffles. These dimensions restricted the maximum weight of a single piece of stone to between 60 and 70 pounds,

according to one witness' estimate. However, another witness testified that actual weighing of samples under supervision of the Port of New York Authority revealed one stone which weighed 86 pounds. This was substantially less than the maximum of 120 pounds permitted by the Port of New York Authority specifications. Most pieces were smaller. Most of them were approximately "eight-inch cobbles."

Defendant's employees unloaded the barges at Port Elizabeth. The unloading was accomplished by clamshell and "orange peel" buckets which were suspended from cranes which were mounted on car floats moored in the vicinity of the dike. The various buckets weighed from approximately four to six tons. A crane lowered a bucket on to the pile of stones in a barge, picked up a bucketful, raised it, and swung it over the appropriate spot on the dike and let the load fall. The car floats tilted somewhat in the water as the cranes swung the buckets back and forth.

As early as May 1963, plaintiff's officers and employees observed damage to the barges as they returned to Secaucus from their trips to Port Elizabeth. The rails, i. e., the sides of the cargo boxes, were dented. The bulkheads at the ends of the cargo boxes were also dented, as were some of the cabins. Keith Callanan complained to Lazar in May and again in June and July as the number of dents increased. Not only were there dents, but the railroad rails which had been laid along the tops of the cargo boxes to protect them began to show breaks and tears.

On one occasion during the summer, Ida returned from Port Elizabeth with a stanchion driven down through her deck. Defendant repaired this at plaintiff's demand. Otherwise, nothing was done to repair the damage during the course of the work. The damage became progressively worse as the summer went on.

Fairly early in the summer Charlie went aground at Port Elizabeth in the

working area where defendant had placed her. Apparently she was not injured by the grounding. Shortly thereafter there was another such incident. To prevent further groundings, plaintiff stationed one of its own employees at Port Elizabeth. He arrived on August 19 and stayed until the work was over. His primary function was to see to it that the barges stayed in sufficiently deep water. He had no responsibility for the discharging operations.

There is ample evidence to show that during the discharging operations the heavy buckets frequently struck the rails, bulkheads and cabins of the barges when the buckets were lowered or raised by the cranes. Sometimes the buckets swung widely as they came down, apparently because of carelessness on the part of the crane operators. At other times the tilting of the car float on which the cranes were mounted made it difficult for the operators, no matter how hard they may have tried, to prevent the bucket from deviating from its proper path in the course of its descent or ascent. At times the clamshell buckets were dropped from the crane on to the barges, striking the rails.

The five barges ceased delivering rip rap to Port Elizabeth on different dates. The first to terminate its rip rap service was Charlie which made its last trip on August 8. Able stopped on August 12. The other three continued into October. The last trips of Baker, Ida and Delta took place on October 11, October 17 and October 20, respectively.

After each barge was withdrawn from the rip rap service, it was surveyed, in accordance with the agreement which the parties had made at the outset. The barges were not used for any other work prior to the survey. Able and Charlie were surveyed on August 22. Baker, Delta and Ida were surveyed on October 23, October 31 and November 8, respectively.

George F. Northrup, the representative of defendant who had participated in the ingoing survey, attended the outgoing surveys but did not sign the survey reports. A representative of defendant's insurance carrier, however, signed all the outgoing survey reports except the one for Delta.

The condition of the barges as reflected by these outgoing surveys was much worse than it had been at the time of the ingoing surveys. Each of them had been badly battered. Ida was in the worst shape. The side rails of the barges bulged out. Dents were so numerous that often they merged together in one continuous depression. The railroad rails on the top of the sides were torn and broken. The bulkheads were buckled and distorted. On some barges the cabin roofs were distorted and in some instances the stovepipe of the cabin stove was pushed through the roof. There were a few tears in the steel plating of the cargo boxes.

There was little or no damage to the bottom two feet of the bulkheads, which had been protected by the timber flooring. There was comparatively little damage to the hulls. There was only one broken bracket.

The surveyors representing plaintiff and defendant's insurance carrier agreed upon the repairs which were necessary with respect to each barge except Delta, where only plaintiff's surveyor signed the survey report. These repairs consisted of renewing large sections of the rails and bulkheads, repairing the cabins, and renewing various parts, such as capstans, chocks, etc. These recommended repairs are shown on the survey reports which I find accurately recorded the work which needed to be done. There is no need to repeat all their detail here.

Although it was obvious that each of the barges needed extensive repairs, they were still able to float and were not totally unfit for any service. In fact, they were used by plaintiff to carry other commodities before they were repaired. The repairs were eventually made at the shipyard of Rodermond Industries, Inc. in Jersey City. Accord-

ing to the dates of Rodermond's bills, Able, Charlie and Ida were repaired in March 1964, and Baker and Delta in May 1964. Although we are not at the moment concerned with the issue of damages, as distinct from that of liability, the cost of these repairs has some relevance as an indication of the general extent of the damage. The bills rendered by Rodermond to plaintiff show a repair cost for Able of $18,921, Baker $19,871, Charlie $19,960, Delta $21,617, and Ida $19,849.

■ I have found that at the very beginning, defendant orally agreed to pay for all damage for which defendant's employees were responsible. I interpret this to mean all damage caused by the discharging of the barges or by any other act of defendant's employees, whether negligent or not. There is some evidence to show that in the very nature of this rough work, some damage to the barges is reasonably to be expected, no matter how careful the crane operators may be. It was doubtless because of this that Callanan insisted on the promise of indemnity which defendant made. Therefore, the fact that some of the damage may well have occurred without any negligence on defendant's part does not relieve defendant from liability under its agreement.

Defendant's commitment, however, did not include damages due to causes other than the acts of defendant's employees. I will consider defendant's contentions in this respect in a moment. Before doing so, mention must be made of another problem which presents practical difficulties.

Obviously, the purpose of surveying the barges at the beginning and at the end of the rip rap service was to establish their condition at those respective times. Defects which existed at the end which did not exist at the beginning constituted the damage which the barges suffered during their period of service. Defendant was not obligated to repair dents, cracks, etc., in the barges which were there before the barges began to transport the rip rap.

Although this principle is clear, it is impossible, on the present state of the evidence, to apply it with strict accuracy. The ingoing surveys listed in exhaustive detail each individual dent and crack, but the outgoing surveys did not. By that time the bulges and dislocations were so extensive that the surveyors did not consider it practicable to itemize each one. Consequently, with respect to rail and bulkhead damage, they contented themselves with notations such as "bulkhead buckled and distorted," and with recommendations such as "crop and renew 75' of the railing."

It is apparent that to some extent repairs made on these barges in 1964 corrected conditions which had existed in the spring of 1963. Some allowance should be made to defendant by virtue of this fact. This matter may more properly be considered further at the subsequent hearing on the issue of damages. For the present, it is fair to say that the evidence shows that by far the greater part of the damage which was ultimately repaired arose during the course of the rip rap service.

■ Defendant contends that this damage was not caused by the discharging operations, but rather by the negligence of plaintiff's employees in loading the barges at Secaucus. The evidence does not support this claim. It is true that the stone fell into the barges from an appreciable height. It is not unlikely that at times stones bounced off the decks or glanced off the rails into the water. But there is nothing to show that this occurred frequently, or that it could have caused the buckling of the sides of the cargo boxes and the distortion of the bulkheads that these barges eventually displayed. The men who did the loading testified that they performed it without injury to the barges. On the whole, I accept their testimony. I find that the cause of the damage to the superstructure of the barges, i. e., to the cabins and the cargo

boxes, the rails and the bulkheads, was the blows of the discharging buckets, not the loading operations.

Defendant also urges that the barges were not suited for the hard work of transporting rip rap. As far as Able, Baker, Charlie and Delta are concerned, this in substance comes down to the claim that the steel rails and bulkheads were not strong enough to resist the buffeting that they received. But defendant's expert conceded that the brackets on these four barges were sufficiently strong to support the cargo box against the weight of stone pressing against it. And he also conceded that it would not be economic to use steel so thick and strong that it could withstand the banging of a six-ton bucket without damage. To do this would be "building a battleship."

■ Defendant's expert voiced the opinion that the cargo boxes were materially weakened by the weld cracks which existed before they began to carry the rip rap. Plaintiff offered evidence to the contrary. I am not persuaded that these original weld cracks were of any significance. On all the evidence, I find that Able, Baker, Charlie and Delta were suitable for rip rap service and that the damage which they sustained was not caused or contributed to by any defect of design, construction or previous condition.

As to Ida, defendant's case is somewhat stronger. Her design differed from the others in that the brackets which supported the sides of the cargo box rested only on the deck. They were not supported by the frame of the vessel, as the brackets on the other barges were. Therefore, they were not as effective as the others in supporting the sides of the cargo box.

Defendant's expert testified that Ida was not suited "for the carrying of any kind of cargo." This is an extreme view which I do not adopt. After all, Ida was a steel barge, built only a year or so before. She can hardly be said to be a fragile vessel.

■ It is true that Ida was not as sturdy as the other four barges. It is reasonable to believe that this is why the sides of her cargo box were more bowed out than the others at the end of the work. It does not follow, however, that defendant may therefore escape liability for the damage caused by the blows to which defendant's employees subjected her. Although, as events turned out, it may be that her selection for this job by plaintiff was an unfortunate choice, there is nothing to show that plaintiff was aware of any weakness in Ida's design which made her less capable of resisting blows than the others were. Defendant never raised any question while these events were going on as to Ida's suitability for the work. For the purposes of defendant's agreement of indemnity, I believe it fair to say that defendant must be deemed to have taken Ida as it found her, so to speak, and that having damaged her, it is now too late for defendant to say that plaintiff should not have exposed her to risk of that damage.

On this question of causation, I have dealt thus far with damage to the cargo boxes and cabins. This is where most of the damage occurred. As to that, I have found that the damage was caused by blows from the buckets used by defendant in discharging the cargo. There may well be other parts of the vessels' superstructure, in addition to the cargo boxes and cabins, which fall into the same category.

■ It appears, however, that there was also some damage, said to be comparatively light, to the hulls of the barges well below the cargo boxes, and perhaps even in a few instances to the plates on the bottoms of the barges. The evidence does not satisfy me that such defective conditions were caused by defendant's buckets or by any other acts of defendant's employees. The evidence as to the cause of this type of damage was very meager. Plaintiff had the burden of proof on the issue of causation. It has failed to sustain that bur-

den, as far as such items of damage are concerned.

Since the outgoing surveys are written in highly technical language which often is incomprehensible to the uninitiated without explanation, I cannot be sure, merely by reading the outgoing surveys, into which category certain defects should be classified. An opportunity will be afforded to plaintiff at a subsequent hearing on damages to explain in layman's language the technical terms used in the outgoing surveys.

■ I turn now to the legal question of the validity of the oral agreement which the parties made. Lazar, defendant's president, testified that on other jobs defendant agreed to ingoing and outgoing surveys and that in such instances, "if there's been damage, if the property owner claims they have been damaged, we or our insurance company pay for it." He testified that in those cases "our responsibility is spelled out in the contract." It is apparently defendant's position that since in the present case the purchase order contained no promise to pay for damage, defendant is not liable. This contention cannot be sustained.

If we adhere strictly to the form of the transaction, we have a written contract between plaintiff and Hudson, a written contract between Hudson and defendant, and an oral contract between plaintiff and defendant. In form, plaintiff agreed to sell the stone to Hudson at $2.00 per ton delivered in Port Elizabeth. Hudson agreed to sell it to defendant at $2.45 per ton delivered in Port Elizabeth. Since plaintiff was already bound by its contract with Hudson to deliver the stone to Port Elizabeth, the question arises as to whether there was any consideration for defendant's oral promise to plaintiff to pay for damage that the barges suffered in the course of discharging their cargo at Port Elizabeth.

■ The written contract between plaintiff and Hudson contains no details as to how the stone shall be delivered (except that it is to be shipped "by scow"), and no details as to how the scows or barges shall be discharged. On this particular job, the method of discharge by heavy buckets suspended from cranes mounted on a moving float, was fraught with risk of damage to the superstructure of the barges, as the parties realized. It can be said that under these circumstances, plaintiff's promise to employ its own barges in this dangerous operation was something more than its contract with Hudson already obligated it to do, and hence that this promise afforded adequate consideration for defendant's promise to pay for the damage.

Restatement of Contracts § 84(c) (1932)

1A Corbin, Contracts § 192 (1963) I Williston, Contracts § 131B (rev. ed. 1936)

In my view, however, the same result is reached somewhat more readily by another approach, *i. e.*, one which looks to the substance of the transaction rather than to its form. Plaintiff was actually the principal in this enterprise. It owned the quarries, it owned the barges, it loaded the barges at Secaucus, and it caused them to be towed to Port Elizabeth. Gallo, or his company Hudson, was in fact nothing more than a sales agent who received a commission on this contract. After observing the witnesses on the stand, I have no doubt that Keith Callanan was in charge. He arranged the meeting with Lazar. He made the decisions. He or his employees carried them out.

In substance, therefore, there was only one contract, *i. e.*, a contract between plaintiff and defendant. Part of this contract was in writing, embodied in the purchase order. The purchase order was addressed by defendant to Hudson in accordance with Callanan's instructions, presumably in order to comply with the form of plaintiff's agreement with Hudson. The other part, consisting of the agreement to cover the decks with concrete or timber, to survey the barges

before and after the service, and to pay for the damage, was oral. I have no doubt that if defendant had not agreed to the oral part, it would not have received the stone, and that defendant so understood. Since defendant wanted the stone, it made the oral agreement. There was thus consideration for defendant's promise.

 In my opinion, the written purchase order was not such a complete document as to amount to a fully integrated contract which would preclude any oral terms. The purchase order was prepared by defendant on defendant's printed form. No doubt if Callanan and Gallo had been more careful, they would have insisted that it set forth these oral terms of the agreement. As far as appears, this transaction was handled without the benefit of legal advice, as many business transactions are. The documents were not as complete as a careful lawyer would have wished. But the court must deal with them as they are. After consideration, I conclude that here the oral terms supplement rather than contradict the written terms of the contract. Hence, the fact that the purchase order omitted part of the agreement which the parties had orally made is not fatal to plaintiff's right to recovery. *See* Laskey v. Rubel Corp., 303 N.Y. 69, 100 N.E.2d 140 (1951) (dictum); Routledge v. Worthington Co., 119 N.Y. 592, 23 N.E. 1111 (1890); Gevaert Co. of America, Inc. v. Rock Land Corp., 36 Misc.2d 513, 232 N.Y.S.2d 517 (1962).

I conclude that plaintiff is entitled to recover for defendant's breach of contract to the extent indicated in this opinion. In view of that conclusion, it is unnecessary to consider plaintiff's alternative claim based on negligence.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

A hearing will be held before the court on the issue of the amount of plaintiff's damage. For the convenience of all concerned, the hearing will be held in New York rather than in Albany. I will set it down for 10:00 A.M. on January 29, 1968. If this date is not convenient for counsel, another date will be fixed on their request.

So ordered.

## OPINION ON ISSUE OF DAMAGES

In the court's opinion on the issue of liability filed on December 14, 1967, I held that the parties had entered into a valid contract by which defendant undertook to pay for all damage to plaintiff's barges caused by any act of defendant's employees in discharging their cargo of rip rap stone, and that defendant had failed to perform that contract. I fixed January 29, 1968 as the date for the taking of testimony on the amount of plaintiff's damage. Subsequently that hearing was adjourned several times at the parties' request and was finally held before me in New York on June 27, 1968.

The background facts, already set forth in the opinion of December 14, 1967, may, for convenience, be briefly recapitulated as follows.

The five barges ceased delivering rip rap to defendant on various dates from August 8, 1963 to October 20, 1963. Each of the barges was damaged as a result of the discharging operations. The damage relevant here was primarily to the cargo boxes, which were badly battered, and to the cabins and other parts of the superstructure. The barges were surveyed by representatives of the parties on various dates from August 22, 1963 to November 18, 1963. They were repaired at the shipyard of Rodermond Industries Inc. (Rodermond) in Jersey City. Three of them were repaired in March 1964 and the other two in May 1964. The bills rendered by Rodermond to plaintiff for the repair work, some of which I have found was not within the scope of defendant's undertaking, aggregated $100,218.

Although no testimony on the point was introduced at the hearing on June 27, it appears to be undisputed, and I

will assume it to be the fact, that the parties did not communicate with each other about the repair work between the time when the surveys were completed and the time when the repairs were made. Defendant did not inquire of plaintiff as to where plaintiff intended to have the repairs effected and plaintiff did not volunteer that information. After a delay of several months, plaintiff sent its barges to Rodermond, had their cargo boxes replaced and other repairs effected, and sent the bill to defendant.

At the hearing on June 27, the parties stipulated that:

"The reasonable cost of shipyard repairs to plaintiff's five scows for that portion of damage for which defendant was held liable and including an allowance by reason of pre-existing damage conditions is $74,500; * * * "

Plaintiff claims that it is entitled to recover this amount. Defendant disputes that claim on the theory that the reasonable cost of shipyard repairs is not the proper measure of damage here. Defendant contends that if plaintiff had consulted defendant in advance, defendant would have directed it to a place where the repairs could have been accomplished at a substantially lower cost.

In support of this contention, defendant called as a witness Samuel D. Kapelsohn, vice president of Grand Iron Works, whose place of business is on Tiffany Street in the Bronx. Grand Iron Works is in the business of fabricating and erecting steel for buildings and bridges. Defendant is one of its customers. It is not in the marine trade. More specifically, it has never replaced cargo boxes on steel barges, although Kapelsohn personally did some work of that sort in the late 1930s and early 1940s. Grand Iron Works' place of business is inland. It owns no pier facilities.

Kapelsohn testified that if his company had been asked to repair these barges in late 1963 or early 1964, it would have been in a position to do so and that it would have charged $28,860.

He testified that he would have prefabricated the steel parts in his company's shop and would then have moored the barges at a pier owned by the City of New York at the foot of Tiffany Street where he would have removed the old cargo boxes and installed the new ones. Concededly his company had no permit to use a public dock for a private repair operation, but he was confident that this would not have caused any difficulty. He estimated that the work would have required the use of the dock for a period of from two to four weeks. He said he would have moored three barges to the pier at one time, one outside the other, so that the workmen could move from the pier to the first barge and then to the second and the third. He testified that no staging would be required, and that the welders could safely stand on a deck 18 inches wide on the outside of the rails of the barges to do their work.

Plaintiff called a marine surveyor, Sheridan, who expressed the opinion that Kapelsohn's proposed method of operation was not practicable, particularly in the absence of staging for the workmen's safety. He also questioned the validity of Kapelsohn's estimate of cost. He said that he had never heard of anyone repairing barges in this fashion at a public pier or in a structural steel plant. He said that the normal practice was to repair a vessel in a shipyard.

Sheridan testified that Rodermond was an experienced shipyard with a reputation for doing good "harbor work," i. e., repairing barges, tugs, scows, etc. He also testified that shipyard prices for structural steel work were higher than those of an inland structural steel plant like Grand Iron Works because the shipyard's cost was higher for labor, more elaborate equipment and overhead.

There is no claim that plaintiff had ever heard of Grand Iron Works or that plaintiff could reasonably have been expected to know of its existence. The defendant claims, however, that plaintiff was under a duty to consult defendant in

advance about the repairs so that defendant would have had an opportunity to arrange for Grand Iron Works to do the work.

The only authority which defendant cites for this proposition is a state court case, Feuer v. Menkes Feuer, Inc., 8 A.D.2d 294, 187 N.Y.S.2d 116 (1st Dept. 1959). That case involved a wholly different situation. There defendant had agreed to indemnify plaintiff against any claims which might be made against plaintiff arising out of his connection with defendant's business. The agreement provided that plaintiff would notify defendant of any such claims. Plaintiff proceeded to settle such a claim without notifying defendant and then sued to recover the amount of the settlement. The court held that plaintiff was not entitled to summary judgment because, since he had not notified defendant of the claim, he must establish the reasonableness of the settlement, a question of fact.

■ In my opinion this decision has no bearing upon the issue here. In the absence of any authority to the contrary, I hold that plaintiff was not obligated to consult defendant in advance about the repair of the barges. Defendant was free at all times to suggest Grand Iron Works to plaintiff if defendant so desired. It is at least doubtful that even defendant had Grand Iron Works in mind at the time. The evidence is that defendant first asked Kapelsohn for an estimate in January 1968, which was after this court had filed its opinion determining the issue of liability in favor of plaintiff.

■ Moreover, I am not persuaded that Grand Iron Works could have properly made these repairs in any event. It had never done similar work. The proposal to make free use of a city-owned pier for up to four weeks in order to carry out the job seems highly unrealistic. In my opinion, even if plaintiff had been informed of Grand Iron Works' existence, it would not have been obligated to entrust its barges to such an unorthodox operation.

Finally, Kapelsohn's estimate of cost seems too low. Apparently there is a difference between shipyard prices and the prices of inland structural steel plants, but I am not convinced that the difference in this instance would be anywhere near as large as defendant claims. Kapelsohn's estimate seems to be a purely theoretical figure computed without reference to the practical difficulties in the way of the type of operation which he envisaged.

Plaintiff took its barges to a reputable shipyard. That is the normal place to have barges repaired. It is stipulated that the shipyard's charges were reasonable, for a shipyard. There is no suggestion, and in view of the stipulation there could be none, that any of the work was unnecessary or that the bill was padded. Cases cited by defendant which involved the unnecessary replacement of sound portions of the vessel (see The J. T. Easton, 24 F. 95 (S.D. N.Y.1885); Petition of Metropolitan Sand & Gravel Corporation, 170 F.Supp. 675 (E.D.N.Y.1958)) are obviously not in point.

■ Under these circumstances, to deny plaintiff recovery for the shipyard cost of repairs would require convincing evidence that the work could have been done properly elsewhere at a lower cost. Navigazione Libera T.S.A. v. Newtown Creek Towing Co., 98 F.2d 694 (2d Cir. 1938). The evidence here is not convincing enough.

I conclude, therefore, that $74,500 is the reasonable cost of repairing the damage to the barges for which defendant is responsible. Plaintiff is entitled to recover that amount. The parties have stipulated that interest shall run from January 1, 1965. The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 52(a) this opinion constitutes the court's findings of fact and conclusions of law on the issue of damages.

So ordered.